**BUILDING AND CONSTRUCTION TRADES DEPARTMENT, AFL–CIO, et al., Plaintiffs,**

v.

**Joe M. ALLBAUGH, Director Federal Emergency Management Agency, et al., Defendants.**

**No. 01–0902(EGS).**

United States District Court, District of Columbia.

Nov. 7, 2001.

Laurence J. Cohen, Esquire, Terry R. Yellig, Esquire, Victoria L. Bor, Esquire, Jonathan D. Newman, Esquire, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, DC, for Plaintiffs.

Raymond Larizza, Esquire, Senior Trial Counsel, U.S. Department of Justice, Washington, DC, for Defendants.

Arnon D. Siegel, Esquire, Robbins, Russell, Englert, Orseck & Untereiner, Washington, DC, for amicus New York State Thruway Authority.

Kristian M. Dahl, Esquire, National Right to Work, Springfield, VA, for amicus National Right to Work Legal Defense Foundation.

Maurice Baskin, Esquire, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, for amicus Associated Builders, Inc., et al.

Terri E. Gerstein, Esquire, Attorney General of the State of New York, New York, NY, for amicus State of New York.

Stanley Mallison, Esquire, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Francisco, CA, for amicus National Economic Development & Law Center and the Sierra Club.

Linda D. Strozyk, Deputy Counsel, Michael D. Berman, Deputy Chief of Litigation, Edward S. Harris, Counsel, Kevin Reynolds, Asst. Atty. Gen., Maryland Department of Transportation, Baltimore, MD, for amicus Maryland Department of Transportation.

Kirsten Engel, Esquire, Assistant Attorney General, Boston, MA, for amicus the Commonwealth of Massachusetts.

### *MEMORANDUM OPINION*

SULLIVAN, District Judge.

Plaintiffs Building and Construction Trades Department of the AFL–CIO ("BCTD"), Contra Costa Building and Construction Trades Council ("Contra Costa BCTC"), and the City of Richmond ("Richmond") commenced this lawsuit to enjoin the enforcement of Executive Order 13202 ("EO 13202"), issued by President George W. Bush on February 17, 2001. EO 13202 prohibits federal agencies or recipients of federal funding from requiring or prohibiting Project Labor Management Agreements ("PLAs") in the bid specifications or other authorizing documents for construction contracts. Plaintiffs argue that EO 13202 is without authority and is preempted by the National Labor Relations Act ("NLRA"). Plaintiffs

have named as defendants the federal agencies that are tasked with implementing EO 13202 and that provide funding subject to EO 13202 for construction projects in which the plaintiffs are involved.

Pending before the Court are cross-motions for summary judgment. Upon consideration of the parties' motions, oppositions, replies, and counsels' representations at oral argument, the motions by amicus curiae, as well as the applicable statutory and case law, the Court concludes that the plaintiffs' motion for summary judgment and for permanent injunctive relief must be **GRANTED** and the defendants' motion for summary judgment must be **DENIED**. Constitutional and statutory precedent of long-standing persuades the Court that the President lacked the requisite authority for Executive Order 13202. Accordingly, enforcement of EO 13202 is permanently enjoined.

## BACKGROUND

1. *Project Labor Management Agreements*

Executive Order 13202 prohibits federal agencies and recipients of federal funding from requiring or prohibiting PLAs in the implementing documents for construction projects. Exec. Order No. 13,202, 66 Fed. Reg. 11225 (February 22, 2001), *amended by* Exec. Order No. 13,208, 66 Fed.Reg. 18717 (April 6, 2001). PLAs are "pre-hire" collective bargaining agreements that are generally prohibited by the NLRA. Contractors or owners and labor unions in the construction industry, however, are explicitly exempted from that prohibition. *See* 29 U.S.C. § 158(e)-(f) (2001). A PLA is negotiated between an employer that has control over a particular construction project and a group of unions in order to meet the specific labor needs of that project. PLAs bind all contractors and subcontrac-

tors to a variety of provisions, which generally include: (1) recognition of signatory unions as sole representatives of covered workers; (2) prohibition of strikes and lockouts; (3) a dispute resolution process; (4) uniform rules on overtime and working hours; (5) hiring through union referral systems; and, (6) set wages for craft workers. *See* United States General Accounting Office, Report to Congressional Requesters, *Project Labor Agreements: The Extent of Their Use and Related Information* (May 1998).

PLAs are generally negotiated at the beginning of a construction project. Once an agreement has been reached, the employer will award contracts only to those contractors and subcontractors who agree to abide by the PLA. The process by which the PLA is negotiated and the contracts are awarded differs slightly depending on whether an employer is a private or public entity.

Private employers may negotiate directly with labor unions to create a PLA that will bind all contractors and subcontractors on a project to its terms. The employer can then either simply hire contractors who agree to abide by those terms, or grant the contracts through a competitive bidding process. If there is a bidding process, the employer will include the PLA in the bid specifications as a material requirement.

For public entities, the process is slightly more complicated. The process includes assessing the value of a PLA for a particular project, selecting a construction or project manager to negotiate and implement the agreement, negotiating the agreement, reviewing the agreement, and enforcing the agreement. Most public entities by law must use a competitive bid process to award contracts. *See* Mem. of Law of Amicus Curiae New York State

Thruway Authority. A negotiated PLA is enforced by including it in the bid specifications for the project. Most state competitive bidding statutes require that a PLA be included in the bid specifications for a project as a material condition. *Id.* at 5 n. 6.

In the absence of a PLA, individual unions and individual contractors can negotiate pre-hire agreements that set the terms and conditions for the workers and subcontractors who work for that particular contractor. However, these individual pre-hire agreements are not PLAs in that they can not establish uniform standards for an entire project.

### 2. *EO 13202*

Section 1 of EO 13202 applies to federal agencies who award construction contracts, and specifies the substantive prohibitions of the EO. Section 3 of EO 13202 applies to recipients of federal funding and incorporates the prohibitions of § 1:

Section 1. To the extent permitted by law, any executive agency awarding any construction contract after the date of this order, or obligating funds pursuant to such a contract, shall ensure that neither the awarding Government authority nor any construction manager acting on behalf of the Government shall, in its bid specifications, project agreements, or other controlling documents:

(a) *Require or prohibit bidders, offerors, contractors, or subcontractors to enter into or adhere to agreements with one or more labor organizations, on the same or other related construction project(s);* or

(b) Otherwise discriminate against bidders, offerors, contractors, or subcontractors for becoming or refusing to become or remain signatories or otherwise to adhere to agreements with one or more labor organizations, on the same or other related construction project(s).

(c) Nothing in this section shall prohibit contractors or subcontractors from voluntarily entering into agreements described in subsection (a).

Sec. 3. To the extent permitted by law, any executive agency issuing grants, providing financial assistance, or entering into cooperative agreements for construction projects, shall ensure that *neither the bid specifications, project agreements, nor other controlling documents* for construction contracts awarded after the date of this order by recipients of grants or financial assistance or by parties to cooperative agreements, nor those of any construction manager acting on their behalf, *shall contain any of the requirements or prohibitions set forth in section 1(a) or (b) of this order.*

Executive Order 13202, 66 Fed.Reg. 11225 (February 22, 2001). EO 13202 states that its authority lies in "the Constitution and laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 471 *et seq.*" *Id.*

EO 13202 superceded President Clinton's June 1997 memorandum, which directed that executive agencies "may, on a project-by-project basis, use a project labor agreement on a large and significant project" when that agency determines it will "advance the Government's procurement·interest in cost, efficiency and quality and in promoting labor-management stability ..." President's Memorandum, "The Use of Project Labor Agreements for Federal Construction Projects" at 1, 1997 WL 309842 (June 5, 1997). The memorandum filled the vacuum created when President Clinton repealed the former President

George Bush's Executive Order 12818[1], which explicitly prohibited the use of the PLAs in contracts in which federal agencies were parties. *See* "Revocation of Certain Executive Orders Concerning Federal Contracting," Exec. Order No. 12,836, 58 Fed.Reg. 7045 (Feb. 1, 1993), revoking Exec. Order No. 12818, 57 Fed.Reg. 48713 (Oct. 23, 1992).

### 3. *Plaintiffs*

Plaintiff BCTD is a an organization within the AFL–CIO consisting of fourteen national and international unions representing more than one million employees in construction and related industries throughout the United States and Canada. *See* Pls.' Motion for Summ. J., Ex. 4 (Second Decl. of Edward C. Sullivan). BCTD is the parent organization to over 300 local building and construction councils in the United States, including the Contra Costa BCTC, also a plaintiff here. *Id.* The Department and its affiliated councils are parties to PLAs across the United States on projects conducted by both private and public entities. *Id.* at ¶ 6 Prior to the issuance of EO 13202, many of these PLAs were on federal agency projects and projects receiving federal financial assistance. *Id.; see also* Pls.' Motion for Summ. J., Ex. 5 at ¶ 4 (Decl. of Wlliam "Giz" Kaczorowski).

BTCD entered into a PLA with the construction manager for Maryland's State Highway Administration, for the purpose of participating in Maryland's construction of the Woodrow Wilson Bridge Project. The project was slated to receive over $1.5 billion in Department of Transportation funds. BTCD's PLA was submitted to the Federal Highway Administration ("FHWA") in order to be included in the State's bid solicitation for the project, but was denied by FHWA because FHWA believed the PLA was prohibited by EO 13202.

Richmond was planning on negotiating PLAs in two of its upcoming urban renewal construction projects with plaintiff Contra Costa BCTC, the Richmond Transit Village ("RTV") and the Ford Assembly Plant ("Ford"). Both projects secured funds from FEMA and HUD of $4.5 million and $20 million respectively, and the RTV project also received approximately $1.7 million of DOT funds. The City Council passed a resolution deciding not to authorize a PLA, citing their belief that EO 13202 would bar federal funding needed to complete the projects. FEMA and HUD since informed Richmond that EO 13202 did not apply to funding pledged by their agencies, as it was already awarded before EO 13202 was executed. The DOT funds for the RTV project are subject to EO 13202. Richmond has not indicated whether it would change its decision on including PLAs as a result, or whether it would be unable to do so for want of the DOT funds.

Richmond also claims it has numerous proposals for construction contracts pending anticipated federal funding, some of which Richmond would normally negotiate a PLA for. In addition, the plaintiffs also cite three other examples of projects that both anticipate receipt of federal funding, and expressed an intention to utilize a PLA before EO 13202 issued. These projects include the St. Louis Airport project, the Washington State Capitol, and the Walnut Creek–San Ramon Valley Improvement Project.

1. Executive Order 12818, titled "Open Bidding on Federal and Federally Funded Construction Projects," October 23, 1992, revoked by Executive Order 12836, titled "Revocation of Certain Executive Orders Concerning Federal Contracting," Feb. 1, 1993.

### 4. *Procedural History*

The plaintiffs, BCTD, Contra Costa BCTC, and Richmond, filed a motion for preliminary injunction and summary judgment against the defendant federal agencies, claiming that EO 13202 was unauthorized and preempted by the NLRA. Defendants filed a motion to dismiss or, in the alternative, for summary judgment, claiming that plaintiffs lacked standing to sue and that EO 13202 was valid.

Amicus Briefs were filed on behalf of the plaintiffs by: the State of Maryland, the New York State Thruway Authority, the State of New York, the Commonwealth of Massachusetts, and the National Economic Development & Law Center and the Sierra Club. On behalf of the defendants, amicus briefs were submitted by the Associated Builders and Contractors, Inc.,[2] and the National Right to Work Legal Defense Foundation, Inc.

On August 13, 2001, this Court granted plaintiffs' motion for preliminary injunction with respect to enforcement of EO 13202 and the Woodrow Wilson Bridge Project bid specifications that were to be advertised on August 14, 2001. The Court found that plaintiffs would suffer irreparable harm if the bid specifications were advertised without the PLA requirement, and that the plaintiffs were likely to prevail on the merits of their NLRA preemption claim.

In response to this Court's order, on August 20, 2001, the State of Maryland submitted a revised PLA to the Federal Highway Administration for its review, stating that it intended to include the PLA in the bid specifications for the superstructure contract by addendum upon approval by FHWA. *See* Defs.' Mem. of P. & A. in Opp'n to Pls' Mot. for Summ. J. and Mem. of P. & A. in Reply to Pls' Opp'n to Defs.' Mot. to Dismiss, or in the Alternative for Summ. J. (hereinafter "Defs.' Opp'n and Reply"), Ex. 2 (August 20, 2001, letter from Parker Williams, Administrator of the Maryland State Highway Administration to FHWA). The FHWA has approval authority over the bid specifications on this project. On September 25, 2001, Administrator of the Maryland State Highway Administration wrote to the FHWA indicating that Maryland had not yet received a response to the revised bid specifications and also to a final financial plan submitted on September 4, 2001. *See* Pls.' Reply to Defs.' Opp'n to Mot. for Show Cause Order, Ex. 1. Maryland's letter reiterated its concern that it receive a reply by September 28, 2001, or the October 18, 2001, bid opening date for the superstructure contract would be delayed. *Id.*

On September 28, 2001, the FHWA replied to the State of Maryland's letter of September 25, 2001 in two separate letters. *See* Pls' Unopposed Mot. for Leave to Supplement Reply to Defs.' Opp'n to Mot. for Show Cause Order. The first September 28, 2001 letter approved the Financial Plan, thereby removing that impediment from proceeding on the superstructure contract. The second September 28, 2001 letter referred specifically to the bid specifications that were revised to include the PLA after this Court entered the preliminary injunction on August 13, 2001. In that letter, the FHWA stated:

> With regard to the PLA, the FHWA has on several occasions advised the State that the recent judicial decision prelimi-

---

**2.** Joining this same amicus brief were the Associated Builders and Contractors of the Metropolitan Washington, Inc., Associated Builders and Contractors, Golden Gate Chapter, Hispanic Chamber of Commerce of Contra Costa County, Western Electrical Contractors Association, Independent Roofing Contractors of California, and the Coalition for Fair Employment in Construction.

narily enjoining President Bush's Executive Order has required us to develop standards and procedures for reviewing the Woodrow Wilson Bridge PLA that Maryland submitted on August 20, 2001. That process is not yet complete and until it is, we are not able to properly review and approve or disapprove the PLA.

The FHWA offered no timeframe for when those standards and procedures may be in place. The FHWA further stated that it had already approved one set of bid specifications. The FHWA suggested "[w]e see no reason why Maryland cannot go forward with its scheduled October 18, 2001, bid opening date with the current bid specifications, thus avoiding any delay in the project completion date." The approved bid specifications to which the FHWA referred are the subject of this Court's preliminary injunction.

On October 3, 2001, the State of Maryland informed the Court that it has extended the bid opening for the superstructure contract until November 29, 2001.

### DISCUSSION

Plaintiffs contend that the Executive Order is invalid, as the President lacked constitutional or statutory authority to promulgate EO 13202, and is preempted by the NLRA. Plaintiffs argue that EO 13202 conflicts with the NLRA because: (1) EO 13202 prohibits the use of PLAs by public agencies and the recipients of federal funding; (2) the NLRA authorizes the use of PLAs, or at least intended for the use of PLAs to be unregulated; and, (3) the D.C. Circuit requires that an Executive Order in conflict with the NLRA is invalid under NLRA preemption doctrine and must be enjoined. Defendants argue that plaintiffs

lack standing to challenge EO 13202, the President had both constitutional and statutory authority to promulgate EO 13202, and the EO 13202 does not conflict with the NLRA.

All plaintiffs have standing in this case. The Court rejects the government's extremely narrow understanding of the injury and causation requirements of standing doctrine. Moreover, the Court holds that the President lacked constitutional or statutory authority to promulgate at least Section Three of the EO 13202, which places conditions on the receipt of federal funds. Furthermore, the Court holds that EO 13202 violates both the *Garmon* and *Machinists* NLRA preemption doctrines.[3] EO 13202 violates *Garmon* preemption with respect to federally-funding projects conducted by private entities because the use of PLAs by private entities is expressly protected by the NLRA. EO 13202 violates *Machinists* preemption doctrine with respect to projects conducted by public entities, including both the recipients of federal funding and federal agencies themselves, because EO 13202 alters the balance of economic bargaining power between labor organizations and federally-funded project owners by eliminating the option of requiring a PLA in project bid specifications. Thus, both §§ 1 and 3 of EO 13202 are unlawful.

### I. Standing

The three plaintiffs, BCTD, Contra Costa BCTC, and the City of Richmond, have met the constitutional standing requirements. In order to satisfy Article III's standing requirements, a plaintiff must meet three tests: injury, causation, and redressability. *Friends of the Earth, Inc.*

---

**3.** See generally *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Machinists v. Wisconsin*

*Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

*v. Laidlaw Envtl. Serv., Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102–03, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Supreme Court has defined an injury in fact to be "an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Laidlaw,* 528 U.S. at 180, 120 S.Ct. 693. Causation requires that "the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* Finally, redressability demands that "it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

## A. BTCD

### 1. *Individual standing with respect to § 3.*

█ BCTD has suffered a concrete and particularized injury, caused by EO 13202, that can be redressed by enjoining the enforcement of EO 13202. The government has advocated an extremely narrow conception of standing that goes far beyond Supreme Court precedent and the policy of judicial restraint that the standing doctrine reflects.

The government has repeatedly argued that Maryland, as the recipient of federal funding, is a more appropriate party than BCTD and is not present as a party in this case. *See* Defs.' Opp'n and Reply at 34. However, in responding to a similar argument that the "wrong parties" were before the Court, the Supreme Court has held that it is "self-evident" that "more than one party may have standing to challenge a particular action or inaction. Once it is determined that a particular plaintiff is

harmed by the defendant, and that harm will likely be redressed by a favorable decision, that plaintiff has standingregardless of whether there are others who would also have standing to sue." *Clinton v. City of New York,* 524 U.S. 417, 434–436, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998).

### a. *Injury in Fact*

BCTD argues that the injury it has suffered as the result of the enactment of EO 13202 was the loss of the PLA it negotiated with the State of Maryland for the Woodrow Wilson Bridge Project and the ability to negotiate similar agreements with other project owners. That agreement named BCTD as the exclusive bargaining agent for the employees on the project, and determined the terms and conditions of employment for all workers on the project. The loss of that agreement is a particularized and concrete harm to BCTD, a labor organization that stood to play an important role in the project as the exclusive bargaining agent. *Cf. Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 210, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (loss of construction contract by subcontractor resulting from federal financial incentive to general contractors to hire minority-owned businesses sufficient injury to support standing); *Motor & Equipment Mfrs' Ass'n v. Nichols,* 142 F.3d 449, 457 (D.C.Cir.1998) (" '[W]hen a challenged agency action authorizes allegedly illegal [activity] that will almost surely cause [a] petitioner to lose business,' that petitioner has standing to make a claim.") (*quoting El Paso Natural Gas Co. v. FERC,* 50 F.3d 23, 27 (D.C.Cir.1995)). Furthermore, in addition to losing its appointment as the exclusive bargaining agent, BCTD had an interest in the terms and conditions of employment that were amenable to labor interests and reflected in the agreement.

In addition, the loss of the ability to negotiate a global agreement with the State of Maryland or any other project owner that would benefit labor interests and would apply to all contractors on the project is a change in bargaining position that has been recognized by the Supreme Court as an injury for Article III purposes. *See, e.g., Clinton v. City of New York*, 524 U.S. 417, 433 n. 22, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("We have held, however, that a denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result.") The loss of the ability to negotiate and enter into PLAs with recipients of federal funding, to a very large labor organization that regularly enters into such agreements is itself a particularized and concrete harm. BCTD and its member councils are parties to PLAs across the country. They are parties to PLAs with both public and private entities, including recipients of federal funding. As the President of BCTD explained,

> One of the goals of the Department and its affiliated Councils is to exercise our rights under the National Labor Relations Act to negotiate PLAs to govern labor relations on construction projects, and to do so on as many projects as we are able under market conditions ... Prior to the issuance of Executive Order 13202 the Department regularly sought to negotiate, and did negotiate, PLAs on projects receiving federal funding.

Pls.' Mot. for Summ. J., Ex.4 at ¶ 7. The uncontroverted fact that plaintiffs regularly negotiated and entered PLAs with both public and private recipients of federal funding, and are no longer able to do so because of EO 13202, is sufficient injury to support standing to challenge § 1 and § 3 of EO 13202 with respect to both public and private recipients of funding. Pls.' Motion for Summ. J., Ex.4 at ¶ 6.

Defendants argue to the contrary that BCTD has not suffered an adequate injury in fact because the PLA it negotiated with the State of Maryland is outside the protection of the NRLA, and as a result plaintiffs have no legally protected interest under the NLRA on which to base standing. The government's extremely narrow conception of standing's injury requirement is not supported by the Supreme Court's interpretation of Article III of the Constitution. Citing *Lujan*, defendants argue that standing should be limited to an injury to a "legally protected interest." Defs.' Opp'n and Reply at 7. However, defendants then narrow the range of possible legally protected interests on which standing can be based, arguing that when a plaintiff challenges an executive order as preempted by federal statute, the plaintiff's injured interest must be a right created by that statute. Thus, defendants argue that because the PLA negotiated by BCTD does not fall within § 8(e) of the NLRA, BCTD has no legally protected interest on which to base standing to challenge the EO as preempted by the NLRA. *Id.* at 9, 20. This argument misconstrues the language of *Lujan* on which defendants rely and conflates the issue of whether a plaintiff has a private right to sue under a particular statute with the constitutional standing requirement. In order to challenge a government action as violating a particular statute, a plaintiff's injury need not be specifically protected by that statute. For example, in *Bennett v. Spear*, the Supreme Court upheld the standing of ranchers who stood to lose water usage because of a biological decision issued by the Fish and Wildlife Service and who challenged the substance of that biological decision under the citizen suit provision of the Endangered Species Act ("ESA"). 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Clearly, the ranchers' water rights were not protected

by the ESA, but the Court found that loss of the use of water was concrete and particularized injury for Article III purposes sufficient to allow the ranchers to challenge the government's action as unlawful. 520 U.S. at 168, 117 S.Ct. 1154. As the Supreme Court has stated, standing's injury inquiry, grounded in the case or controversy requirement of Article III, focuses not on the nature of the claim, but on the harm to the plaintiff. *See Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated").

Whether or not the PLA negotiated by BCTD falls within § 8(e) of the NLRA is an important question relevant to the merits of this case. Standing, however, does not turn on the applicability of the NLRA to this particular agreement. Even if the Woodrow Wilson Bridge Project PLA is not covered by § 8(e), BCTD had an agreement for that PLA that was rendered unenforceable by an allegedly unlawful government action. Because BCTD lost the benefits it stood to gain under that agreement, its designation as the exclusive bargaining agent for the employees on the project and the agreed upon terms and conditions for employment, as well as the opportunity to negotiate similar agreements with other owners, BCTD has suffered an actual injury sufficient for Article III purposes.

b. *Causation*

Of course, not every government action that somehow interferes with an existing contract or agreement gives the affected parties standing to challenge that government action. In addition to the requirement of injury, a party must show both causation and redressability. *Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693. This is precisely the lesson of *Lujan.* In *Lujan,* the Supreme Court recognized the standing of both those who are the direct objects of government regulation, and those who are impacted by government regulation through less direct means. 504 U.S. at 561–62, 112 S.Ct. 2130; *see also Bennett,* 520 U.S. at 168–69, 117 S.Ct. 1154. The *Lujan* Court indicated that causation is easily satisfied when the injury is the direct result of government action of which the plaintiff is the object. *Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130. Causation may also be established when the impact is less direct, i.e., when the plaintiff's injury is produced by some third party action that is the result of a "determinative or coercive effect" of government action. *Bennett,* 520 U.S. at 168–69, 117 S.Ct. 1154; *Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130. While indirect causation is possible, the Supreme Court has yet to define the precise parameters for determining when indirect causation is sufficient for standing purposes. Each court faced with such a question must determine how much "coercion" is sufficient to hold that the government's action caused a third party's action to injure the plaintiff.

The parties disagree as to the nature of the coercive effect of EO 13202 on the recipients of federal funding who negotiate with labor organizations like BCTD. Defendants contend that there can be no causation between EO 13202 and any harm to BCTD because the decision whether or not to require a PLA or accept federal funding was a voluntary action by an independent third party, the State of Maryland. The fact that a third party made the decision that directly impacted the plaintiff does not foreclose a determination of causation. As the Supreme Court in *Bennett v. Spear* recognized, this argument "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last

step in the chain of causation." 520 U.S. at 169, 117 S.Ct. 1154. The loss of the PLA must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Laidlaw*, 528 U.S. at 181, 120 S.Ct. 693. Thus, in order for this Court to deny standing because of a lack of causation, the decision by the State of Maryland to reject the PLA must be sufficiently voluntary and independent of the threatened loss of federal funding.

Defendants ask the Court to hold that the action of a recipient of federal funds is *necessarily* voluntary when the only threatened sanction is the loss of funds. Defendants concede that as a result of EO 13202, a "grantee may well decide that it would rather retain the federal grant funds and, therefore give up the option of mandating the use of a PLA on a federally financed construction project." Defs.' Opp'n and Reply at 30–31. Thus, defendants argue that even when EO 13202 is the *actual* and *only* cause of a recipient's decision to accept federal funding and forgo a PLA, if there are no sanctions for the recipient beyond losing the funds, the recipient's decision has not been coerced or determined.

■ To borrow the words of the D.C. Circuit, "we need not attempt any broad explanation of the justiciability of indirect injury, for one narrow proposition is clear." *Telephone and Data Systems Inc. v. FCC*, 19 F.3d 42, 47 (D.C.Cir.1994). This Court holds that it is clear that when plaintiffs can prove that the federal government's conditional funding offer is the *actual* and *only* reason for a recipient's decision, causation has been established. In other situations involving conditional funding or financial incentives created by the federal government, when a decision-maker is faced with many factors, it may

well be too speculative to hold that one factor caused a decision. *See, e.g., Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (holding that causation was too speculative when parents of black children challenged IRS' failure to enforce policy of denying tax benefits to racially-discriminatory private schools); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (holding that causation was too speculative between hospital denials of services to the poor and an IRS policy granting favorable tax treatment to non-profit hospitals who offered only emergency room treatment to the poor). Nevertheless, when plaintiffs can prove to the requisite standard of proof that the decision was actually caused by the federal government's threat to cease funding, and only by that threat, no speculation as to causation is required. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (holding that "of course" plaintiff had standing to challenge lost contract when contract loss was actually caused by minority-preference system).

BCTD has presented sufficient uncontroverted evidence here to prove that the State of Maryland's decision to forgo the PLA on the Woodrow Wilson Bridge Project was caused by the promulgation of EO 13202. The plaintiffs negotiated an extensive PLA for the Project. *See* Pls.' Motion for Summ. J., Ex. A. On January 2, 2001, shortly before the agreement was publically announced, the State of Maryland informally submitted the PLA to FHWA for review. *See* Pls.' Motion for Summ. J., Ex. 4 at § 19. On January 8, 2001, the State of Maryland informed potential bidders that a PLA had been negotiated and recommended to be included in the project contracts. *Id.* at § 20; Pls.' Motion for Summ. J., Ex. B. On January 9, 2001, the

PLA was formally submitted to FHWA for review. *Id.* at § 19. In a letter dated January 17, 2001, the FHWA recommended minor changes. *Id.* Those changes were circulated and incorporated into a revised PLA. *See* Pls.' Motion for Summ. J., Ex. A. While the FHWA was reviewing the submitted PLA, on February 17, 2001, President Bush issued EO 13202. In a letter dated February 21, 2001, the FHWA informed Maryland that it was "unable to approve a PLA for this project," because of EO 13202. No other reason was given. *See* Pls.' Motion for Summ. J., Ex. C. Maryland subsequently removed the PLA from the bid specifications and issued contracts on the foundation portion of the bridge that did not include the PLA. *See* Pls.' Motion for Summ. J., Ex. 4 at § 24.

Furthermore, after the Court preliminarily enjoined the application of EO 13202 to the Woodrow Wilson Bridge Project bid specifications to be announced on August 14, 2001, Maryland revised those bid specifications to include the PLA. As explained above, Maryland's request to FHWA for approval of the revised bid specifications was submitted on August 20, 2001 and is still pending. This evidence clearly indicates the but for EO 13202, Maryland would have included the negotiated PLA in its bid specifications for all contracts on the Woodrow Wilson Bridge Project.

Rather than focus on whether EO 13202 was the actual and only cause of Maryland's decision to remove the PLA from the bid specifications, defendants focus on the level of coercion generally caused by an offer of conditional funding. Defendants argue that BCTD lacks standing because the decision by Maryland whether or not to comply with the requirements of EO 13202 in exchange for the federal funding, is *necessarily* a voluntary and independent action of a third party because there is no sanction beyond the threatened loss of funding. However, defendants have not offered sufficient justification, grounded in precedent, conceptions of federalism, or a coherent theory of standing doctrine, on which to base this bright-line distinction.

The implications of defendants' standing argument are great; defendants' interpretation of standing would allow only the recipient of federal funding to ever challenge restrictions placed on the receipt of funds by Congress through legislation or the President though an Executive Order.[4] Without a coherent theoretical justification, this Court declines to hold as a matter of law that in every conditional funding case the only entity with standing to sue is the recipient of the funds.

In support of its argument that decisions to accept funding are never determined or coerced, defendants cite Supreme Court precedent upholding conditional spending grants as legitimate exercises of Congress' Spending Clause authority. *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). However, contrary to defendants' argument, in upholding spending clause statutes, the Court does not address the question of whether a conditional spending grant is "voluntary," or impermissibly "coercive;" rather, the test for the legitimacy of spending clause legislation asks the following: 1) whether the legislation serves the general welfare; 2) whether the imposition of conditions on spending was unambiguous; 3) whether

---

4. From the perspective of a funding recipient, there are no relevant differences in the level of coercion created by conditions on funding placed through an act of Congress or through an Executive Order. Thus, the government's argument about coercion (or lack thereof) in this case would apply to any challenge to legislation authorized by the Spending Clause.

the conditions are sufficiently related to the purposes of the spending; and 4) whether any other constitutional provision bars the condition. *Dole*, 483 U.S. at 207, 107 S.Ct. 2793. Because courts do not assess the coercive impact of conditional spending on a recipient, the defendants' reliance on spending clause doctrine for the proposition that the acceptance of conditional funding is not a coerced decision is misplaced.

Furthermore, a crucial step in the logic of defendants' argument is that a "voluntary" decision is necessarily not a coerced or determined decision for standing purposes. Defendants cite cases for the proposition that compliance with an Executive Order by the recipients of federal funding is voluntary because the Executive Order does not have the force of law. *See AFL–CIO v. Kahn*, 618 F.2d 784 (D.C.Cir.1979) (en banc); *see also* EO 13202 § 11 (stating that the Executive Order creates no legal rights). However, the fact that acceptance of conditional funding is voluntary in the sense that those conditions are not legally enforceable by the recipient, does not necessarily mean that the Executive Order has not *caused* the recipient's decision. Defendants' argument must rest on something more than the fact that Executive Orders are not legally binding.

Defendants also attempt to distinguish *Bennett v. Spear*, where the Court upheld the standing of individuals impacted by a third party decision, by identifying reasons why the third party's decision in *Bennett* was less voluntary than the funding recipients' decisions here. Defendants correctly point out that the level of coercion in *Bennett v. Spear* between the Fish and Wildlife Service's biological opinion under the ESA and the Bureau of Reclamation was greater than what occurred between the federal government and the State of Maryland with respect to the funding for the

Woodrow Wilson Bridge Project. In *Bennett*, the Bureau was free to reject the FWS's opinion only if it presented justifiable reasons for doing so, despite its own lack of expertise in the area, and if it was wrong, the FWS's employees could be subject to criminal sanctions under the ESA. For these reasons, the Court held that the Bureau's decision to follow the FWS's opinion was sufficiently coerced to allow a challenge to the FWS by those ranchers impacted by the Bureau. Importantly, nowhere in *Bennett* did the Supreme Court indicate that *Bennett* established a floor or minimal standard for coercive effect. In fact, the *Bennett* Court thought it was presented with an easy case. *See Bennett*, 520 U.S. at 171, 117 S.Ct. 1154 (indicating that "it is not difficult to conclude that petitioners have met their burden ... of alleging that their injury is 'fairly traceable' to the Service's Biological Opinion"). And as much as the Court was influenced by the potential sanctions on the FWS, it was also convinced by the empirical evidence that the Bureau made its decision because of the FWS opinion, citing the fact that up until the FWS Opinion the Bureau had operated in the same fashion for years and had given no indication of changing the water usage rules for ranchers until the FWS Opinion. 520 U.S. at 170, 117 S.Ct. 1154. Thus, while the facts of *Bennett* do perhaps present a stronger case for a coerced third party decision, nothing in *Bennett* precludes a finding that the State of Maryland's decision was "fairly traceable" to EO 13202.

In addition, the government relies on the standing holding in *Center for Reproductive Law & Policy v. Bush* ("CRLP"), No. 01–CIV–4986(LAP), 2001 WL 868007 (S.D.N.Y. July 31, 2001). CRLP involved a challenge by a U.S. advocacy group to certain conditions on U.S. foreign aid that require recipients to abstain from engaging in abortion-related activities. *CLRP,*

2001 WL 868007 at *1. CRLP claimed that those restrictions impair its advocacy activities by causing foreign recipients of funding to refrain from assisting those activities. *Id.* At first blush, the holding with respect to causation in *CRLP* does seem on point and supports the government's argument. A closer analysis reveals that the District Court's reasoning is conclusory and relies for support only on a Second Circuit decision that did not discuss standing at all. The District Court relied on language from the Second Circuit's decisions in *Planned Parenthood Fed. of Amer. v. AID,* an earlier challenge to similar policies under President Reagan. 915 F.2d 59 (2d Cir.1990) (restrictions were not unconstitutional); 838 F.2d 649, 655–56 (2d Cir.1988) (case did not present non-justiciable issue). The *CRLP* Court has confused the Second Circuit's holding on the merits of the constitutional challenge to the funding restrictions with the causation requirement for standing.[5] Because the District Court provided no other support beyond the Second Circuit's *Planned Parenthood* decision for its conclusion that the funding recipients' actions were sufficiently independent to prevent standing, this Court does not find the *CRLP* decision persuasive.

Furthermore, defendants' position is undermined by Supreme Court precedent. Other Supreme Court cases that uphold standing for plaintiffs impacted when the government alters financial incentives for third parties, indicate that fairly traceable standard requires a level of coercion much lower than the circumstances at issue in *Bennett.* In *Adarand Constructors, Inc. v. Pena,* a white subcontractor who had submitted the low bid on a federally-funded project but was denied the contract challenged the constitutionality of a federal policy of giving financial incentives to general contractors who hire minority subcontractors. 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The recipient of the financial incentive, the general contractor, did not challenge the policy. The Supreme Court did not even question the standing of the subcontractor to challenge the federal policy, writing that "of course" it had standing based on the injury of the lost contract. 515 U.S. at 210, 115 S.Ct. 2097 ("Adarand's allegation that it has lost a contract in the past because of a subcontractor compensation clause of course entitles it to seek damages for the loss of that contract"). The decision by the general contractor in *Adarand* to forgo the low bid and offer the contract to a minority subcontractor was coerced only by the financial incentive, yet the Court did not view that decision as sufficiently independent to break the chain of causation for the subcontractor's injuries.

Similarly, in *Clinton v. City of New York,* the Court held that an association of potato farmers formed for the purpose of *acquiring* potato processing facilities had standing to challenge the line item veto by the President of a statutory provision that gave tax relief to the *sellers* of such facilities. 524 U.S. 417, 432, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998). One of the members of the association was in the process of negotiating the acquisition of a facility when President Clinton utilized the line item veto to eliminate the tax break for the seller of that facility. *Id.* at 426–27,

---

**5.** In order to reach the merits of the plaintiffs' constitutional claims in *Planned Parenthood,* the Second Circuit assumed standing. 915 F.2d at 66 ("we do not address the government's arguments concerning standing"). While such an assumption of standing was clearly improper after *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), it is clear that the Second Circuit's analysis did not address the standing issue at all.

118 S.Ct. 2091. The Supreme Court recognized that the government's action, an elimination of a financial incentive for sellers, created a significant probability of harm to potential buyers so as to fulfill the causation requirement for standing. *Id.* at 432, 118 S.Ct. 2091. The Supreme Court explained that Clinton's veto of the tax relief altered market conditions by eliminating the benefit purchasers had gained when they "received the equivalent of a statutory 'bargaining chip'" to use in negotiations with sellers. *Id.* Similarly, labor organizations possess a bargaining chip in their ability to negotiate with recipients of federal funding to require PLAs on projects. The government's action, EO 13202, has created a significant financial incentive for potential recipients of federal funding to forgo such negotiations with labor organizations, thus substantially altering market conditions by eliminating the labor organizations' bargaining chip. As the Supreme Court held in *Clinton*, "[b]y depriving them of their ... bargaining chip, the [challenged action] inflicted a sufficient likelihood of economic injury to establish standing under our precedents." *Id.* (*citing, e.g., Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); 3 Kenneth Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994) ("The Court routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy [Article III standing].")). If decisions to sell or not sell by the owners of the potato processing plants in *Clinton* were fairly traceable to the federal removal of a financial incentive, so too should be the decision by the State of Maryland to comply with the conditions for federal funding.

For all these reasons, the Court rejects the government's argument that funding recipients' decisions to accept funds are necessarily voluntary and holds that BCTD has met the causation requirement.

### c. *Redressability*

If this Court grants the requested permanent injunctive relief and invalidates EO 13202, Maryland has indicated that it will require a PLA for the Woodrow Wilson Bridge project.[6] After the preliminary injunction hearing on August 13, 2001, Maryland submitted a revised PLA to the FHWA for approval, indicating that it intends to include the PLA in the bid specifications by addendum. *See* Defs.' Opp'n and Reply, Ex. 2. Maryland has since communicated with the FHWA its request that the FHWA approve the revised bid specifications that include the PLA as soon as possible. *See* Pls.' Reply to Defs.' Opp'n to Motion for Show Cause Order, Ex. 1. Maryland clearly intends to include the PLA in the bid specifications should this Court grant permanent injunction invalidating EO 13202. Accordingly, plaintiffs have met their burden of establishing that the proposed injunctive relief will redress the injury caused by EO 13202.

### 2. *Individual standing with respect to § 1.*

BCTD also has standing to challenge § 1 of EO 13202 because it has been injured by EO 13202's prohibition on federal agencies requiring PLAs on construction contracts for federally-owned projects. That injury is the loss of the ability to negotiate and enter into project-wide agreements that benefit labor interests. EO 13202 has taken from plaintiffs the valuable economic weapon of negotiating PLAs with project owners, the opportunity to represent all workers on a project in

---

**6.** Defendants have not challenged standing on    redressability grounds.

collective bargaining, and the beneficial working conditions that PLAs guarantee.

BCTD's injury with respect to federal agencies is real and actual, and not just speculative. Plaintiffs have produced uncontroverted evidence that prior to the effective date of EO 13202, BCTD regularly entered into PLAs with public and private project owners, including both federal agencies and those who receive federal funding. See Pls.' Motion for Summ. J., Ex. 5 at ¶ 4. As the Kaczorowski Declaration explained:

> Each year, the Department and its Councils enter into numerous PLAs. Many of these PLAs involve projects financed at least in part with federal funding, including agreements with federal agencies or federal contractors. The Department and its Councils will continue to enter into numerous PLAs, and but for Executive Order 13202, would continue to do so on projects funded by the Federal Government.

*Id.*

Furthermore, the causal chain with respect to § 1 is clear: EO 13202 prohibits federal agencies from including PLAs in the bid specifications or other contract documents for federally owned projects. EO 13202 does not present federal agencies with a choice; rather it directly prohibits federal agencies from including PLAs in their bid specifications.

Finally, given the size and nature of BCTD, and the regularity with which BCTD entered into PLAs with federal agencies prior to EO 13202, an injunction invalidating § 1 will result in BCTD's negotiations of further PLAs on federally-owned projects. There is nothing in the record to suggest that some other intervening factor will prevent federal agencies from entering any PLAs in the future on construction projects- and when they do, BCTD is the most likely candidate to participate in those negotiations. In addition, the invalidation of EO 13202 will return to BCTD the valuable tool it has lost the ability to negotiate a PLA with federal project owners and their construction managers.

For all these reasons, BCTD has standing to challenge § 1 of EO 13202.

### 3. *Associational standing*

■ BCTD also has associational standing on behalf of its members. In addition to having standing in its own right, an organization or association may have standing to bring suit on behalf of its members when: 1) the members would otherwise have standing to sue in their own right; 2) the interests at stake are germane to the organization's purpose; and 3) neither the claim nor the requested relief requires the participation of the individual members. *Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693; *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Here, plaintiffs argue, and defendants contest, that BTCD has associational standing on behalf of its members in addition to standing in its own right as a labor organization.

■ The above discussion of injury, causation, and redressability also applies to the standing of BCTD's members. Thus, the first prong of the associational standing test is satisfied because BCTD's member unions also have standing in their own right.

The interests at stake in this litigation—the ability of federal agencies and the recipients of federal funding to require PLAs for their projects—are germane to the purpose of BCTD. BCTD is an organization comprised of fourteen national and international unions representing more than one million employees in construction

and related industries throughout the United States and Canada. BCTD is also the parent organization to over 300 local building and construction councils in the United States. Prior to the issuance of EO 13202, BCTD regularly negotiated PLAs with public and private entities, including both federal agencies and recipients of federal funding.

Finally, the equitable relief sought, the invalidation of EO 13202 does not require the participation of those local councils.

### B. City of Richmond

Richmond originally identified two federally-funded projects, the Ford and RTV projects, for which it intended to use PLAs prior to the issuance of EO 13202. *See* Pls.' Mem. in Support of Pls.' Mot. for Summ. J. or, in the Alternative, Application for Prelim. Inj. (hereinafter "Plfs.' Opening Br.") at 19. The Richmond City Council passed a resolution deciding not to authorize a PLA for either project, citing its belief that EO 13202 applied to the federal funding needed to complete the projects.

### 1. The Ford Project.

At the time this case was filed, Richmond was of the opinion that the federal funds to be received for the Ford project from both the Federal Emergency Management Administration ("FEMA") and the Department of Housing and Urban Development ("HUD") were subject to EO 13202. In the course of this litigation, however, the defendants informed Richmond that it may use a PLA on the Ford project without jeopardizing any federal funds because the funds were obligated to Richmond prior to the issuance of EO 13202. Section 2 of EO 13202 specifically exempts contracts awarded prior to the date of EO 13202. Because EO 13202 does not apply to the funds for the Ford

Project, Richmond can not have standing to challenge EO 13202 based on that project.

### 2. The RTV Project.

The parties dispute whether the RTV project can serve as a basis for Richmond's standing in this lawsuit. Richmond will receive federal funding from three sources for the RTV project: FEMA, HUD, and the Department of Transportation ("DOT"). As with the Ford project, neither the FEMA nor the HUD funds are subject to EO 13202 because they were granted prior to February 17, 2001. The DOT funds, however, are subject to EO 13202, and it is on those funds that Richmond bases its standing argument. DOT has committed $1.7 million, which, according to the government, is approximately three percent of the project's anticipated total cost of $55 million.

Defendants challenge Richmond's standing by claiming that Richmond has not been injured by the EO 13202 for two reasons: first, the City has not yet decided whether or not to use a PLA on the project now that only three percent of the federal funds are subject to EO 13202; and second, the City can easily segregate the DOT funds and use a PLA for the rest of the project at no cost to the City or harm to the project.

The City Counsel resolution makes clear that Richmond originally decided not to use a PLA on the RTV project because of EO 13202. *See* Plfs' Opening Br., Ex. C. The loss of a PLA that would benefit Richmond is sufficient injury for standing purposes.

■ However, even if defendants' claim that Richmond has not made a final decision as to whether or not it will use a PLA on the RTV project is true, Richmond still has standing to challenge the federal pro-

gram. The potential loss of millions of dollars in federal funding is sufficient injury to support standing to challenge a federal program. *See, e.g., Hodges v. Shalala,* 121 F.Supp.2d 854, 865 (D.S.C.2000) (state's potential loss of federal funding sufficient injury to challenge federal program); *Kansas v. United States,* 24 F.Supp.2d 1192, 1195 (D.Kan.1998) (same). As a recipient of federal funding subject to EO 13202, Richmond has suffered sufficient injury to support standing.

Second, defendants argue that Richmond has suffered no injury because it is possible to segregate the funds that are subject to EO 13202 from the 97 percent of the project funds that are not. This argument fails for several reasons. First, the plain language of EO 13202 contradicts the defendants' assertion that Richmond should be able to negotiate a PLA for 97 percent of the project as long as the three percent of federal funds subject to EO 13202 are segregated. Defendants cite no language from EO 13202 to support its assertion; in fact, the only authority they cite is a statement from the City Manager that the City may consider this option. Defs.' Opp'n and Reply at 24. The language of EO 13202 is clear: any recipient of federal funding for a project will lose that funding if a PLA is negotiated for the project. Section 3 states: " neither the bid specifications, project agreements, nor other controlling documents for construction contracts ... by recipients of grants or financial assistance ... shall contain any of the requirements or prohibitions set forth in section 1(a) or (b)..." Nowhere does this language indicate that a recipient may segregate funds within a project. In fact, the language of EO 13202 does not even limit the prohibition on required

PLAs to the project for which the funds have been granted it prohibits "construction contracts" by a recipient of federal funding from requiring PLAs. Because the plain language of EO 13202 requires a recipient to give up funding if any of the bid specifications for the project require a PLA, Richmond would not be able to avoid injury by segregating the DOT funds.

Furthermore, even if Richmond could segregate its DOT funds, the loss of a PLA for the portion of the project covered by $1.7 million is still a sufficiently concrete and particularized injury to justify standing. The primary purpose of a PLA is to cover all of the contracts on a project. The loss of that uniformity is a specific and concrete injury. In addition, the cost and inconvenience to Richmond associated with segregating the DOT funds from the FEMA and HUD funds, and with writing a PLA for only 97 percent of the project, would in itself be economic injury sufficient to support standing to challenge EO 13202.

Thus, defendants' arguments that Richmond has not suffered sufficient injury to support standing are unpersuasive. Furthermore, as a recipient of the federal funds in question, Richmond is the direct object of the EO 13202, and therefore easily satisfies the causation requirement for standing.[7] Finally, the requested injunctive relief will redress Richmond's injuries by allowing Richmond to go forward with a PLA on the RTV project or any other federally-funded project.

## C. *Contra Costa BCTC*

The standing arguments for Contra Costa County BCTC are subject to the same analysis as BTCD, discussed above. *See*

**7.** Defendants have not challenged Richmond's standing on either causation or redressability grounds.

Pls.' Opening Br. at 13 n. 14; Defs.' Opp'n and Reply at 25–26, n. 5 (agreeing that arguments for Contra Costa BCTC and BCTD are substantially the same). Contra Costa BCTC is in a similar position with respect to the RTV project as BCTD is with respect to the Woodrow Wilson Bridge Project but for EO 13202, Contra Costa BCTC would have negotiated with the City of Richmond to require a PLA for the RTV project in which it would be the exclusive bargaining agent for employees on that project, and would have helped determine the terms and conditions of employment on the project. *See* Plfs.' Opening Br., Ex. C. The Richmond City Council made clear that it was not requiring a PLA because of EO 13202, and therefore Contra Costa BCTC's injury is fairly traceable to EO 13202. The requested injunctive relief will open the door for Richmond to negotiate and adopt a PLA, thus redressing Contra Costa BCTC's injury. Accordingly, Contra Costa BCTC has satisfied the injury, causation, and redressability requirements.

■ However, the Court need not determine standing for Contra Costa BCTC because it has found standing for BCTD and Richmond. It is well-settled that a court need not determine the standing of all plaintiffs when the standing of others has been established. *See, e.g., Clinton,* 524 U.S. at 431 n. 19, 118 S.Ct. 2091; *U.S. Airwaves, Inc. v. FCC,* 232 F.3d 227, 232–33 (D.C.Cir.2000).

## II. Standard of Review

Summary judgment should be granted only if the moving party has shown that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.), *reh'g en banc granted,* 124 F.3d 1302 (1997). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975).

## III. Constitutional and Statutory Authority

■ The President's authority to issue an Executive Order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *see also Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 188–89, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). Section 3 of EO 13202 stems from neither. To borrow the words of the Supreme Court in *Youngstown,* "The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress it directs that a presidential policy be executed in a manner prescribed by the President." 343 U.S. at 588, 72 S.Ct. 863.

■ EO 13202 cites the President's general authority under the "the Constitution and laws of the United States of America," and in particular, the Procurement Act (or "the Federal Property and Administrative Services Act, 40 U.S.C. 471 *et seq.*"). Despite the fact that the Procurement Act is the only specific authority cited in EO 13202, and despite the fact that defense counsel initially represented to the Court at oral argument that the Procurement Act authorized § 3,[8] defen-

8. *See* Transcript of September 19, 2001 hear-  ing at 78 ("It's a procurement regulation, and

dants have since abandoned this argument because that Act clearly does not provide authority for § 3's conditions on the receipt of federal funding. *See generally* Defs.' Surreply. While § 1 involves contracting by federal agencies, and is arguably authorized by the Procurement Act,[9] § 3 attempts to regulate the conditions of contracts by recipients of federal funding. The Procurement Act, which addresses contracting by the federal government, simply is not relevant to conditions placed on the funding of projects owned and conducted by parties other than the federal government.

Defendants now argue that EO 13202 § 3 is authorized by both the Constitution and several federal statutes other than the Procurement Act. *See* Defs.' Surreply at 1.

### A. *Constitution*

Defendants' constitutional argument rests on the "well-established" power of the President to supervise and guide subordinate executive officials to ensure the consistent execution of the laws. *See* Defs' Surreply at 2 (*citing Meyer v. Bush,* 981 F.2d 1288, 1312 (D.C.Cir.1993)). Because EO 13202 § 3 contains the caveat "to the extent permitted by law," argue the defendants, § 3 is simply a directive by the President to agencies to guide their implementation of existing statutes. Thus, the defendants argue for the very first time in their surreply brief, "in order to determine whether, and to what extent, Section 3 of EO 13202 will apply to a particular grant, the legislation and regulations governing that grant must be examined." Defs' Sur-

reply at 3. Defendants place far too much weight on the words "to the extent permitted by law" than those words can bear.

Defendants' argument that EO 13202 is simply a constitutionally-authorized guidance by the President on the implementation of existing law is unpersuasive. EO 13202 does much more than guide agencies as to how to implement existing statutes it creates substantive prohibitions for federal agencies and substantive conditions on the receipt of federal funding. Once again, the words of the Supreme Court in the *Youngstown* case are particularly applicable here. 343 U.S. at 587–88, 72 S.Ct. 863. In *Youngstown,* the government also argued that the general Article II power of the President to take care that the laws be faithfully executed justified an action without any other basis in the Constitution or statutes. *Id.* The Court rejected that argument:

> In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States * * *.' After granting many powers to the Congress, Article I goes on to provide that Congress may 'make all Laws which

it's true for both 13202, for Section 1 and Section 3. What it says is that the federal government has an interest when it's procuring for itself or when it's giving out money that is going to be used for procurement by somebody else ...''). Defense counsel did also indicate at the hearing that the Constitution authorized EO 13202. *Id.* at 5—7.

9.  The Court need not reach the scope of the Procurement Act and the authority for § 1 because the parties have not briefed that issue. The authority for § 1 is presumed for purposes of deciding the NLRA preemption issue.

shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.'

*Id.* The reasons that the *Youngstown* Court believed the President's action at issue in that case exceeded his Constitutional authority and intruded upon Congress' law-making powers are also particularly applicable here:

> The preamble of the order itself, like that of many statutes, sets out reasons why the President believes certain policies should be adopted, proclaims these policies as rules of conduct to be followed, and again, like a statute, authorizes a government official to promulgate additional rules and regulations consistent with the policy proclaimed and needed to carry that policy into execution. The power of Congress to adopt such public policies as those proclaimed by the order is beyond question.

*Id.* Here, the preamble of EO 13202 sets forth the policy justification for the order, § 1 and § 3 establish substantive rules of conduct, and § 7 directs the Federal Regulatory Council to amend its regulations to implement the order. As the *Youngstown* Court concluded, the Constitution does not independently authorize such a legislative action by the President absent a direct Congressional authorization.

B. *Statute*

In defending the statutory authority for § 3, defendants make two somewhat conflicting arguments. First, as explained above, defendants argue for the very first time in their surreply that, "in order to determine whether, and to what extent,

Section 3 of EO 13202 will apply to a particular grant, the legislation and regulations governing that grant must be examined." Defs' Surreply at 3. Second, defendants argue that there is one general statute that authorizes § 3, independent from the specific statutes under which particular grants have been authorized. That statute is 31 U.S.C. § 6701(1), which authorizes the Director of the Office of Management and Budget (OMB) to issue interpretive guidelines for the use of procurement contracts, grant agreements and cooperative agreements.[10] Defendants' argument with respect to the individual grant-authorizing statutes fails for several reasons. First, there is no evidence in the record that agencies actually make any sort of interpretation of the underlying statutes prior to prohibiting the recipients of federal funding from using a PLA. The FHWA gave no indication of such analysis in any of its letters to the State of Maryland declining to approve the PLA because of EO 13202. Nor can defendants point to any guidelines or regulations instructing agencies to conduct such statutory analyses prior to denying a recipient of federal funding the use of a PLA. In this respect, EO 13202 stands in stark contrast with former President George Bush's Executive Order concerning the use of PLAs. 57 Fed.Reg. 48713 (Oct. 28, 1992). In contrast to the blanket prohibition here, that order provided that:

> The heads of executive agencies shall, within 30 days of the date of issuance of this order, review all statutes under their jurisdiction that provide authority to issue grants or enter into cooperative agreements for construction projects and identify any statute that provides authority to condition a grant award or

---

**10.** The reason these two arguments conflict is that if the OMB statute really provided authority for § 3's conditions on grant assistance, there would be no need to examine the scope of each individual grant statute for independent authority.

cooperative agreement on the recipient's or party's agreement that neither bid specifications, project agreements, nor other controlling documents pertaining to the grant or cooperative agreement contain any of the elements specified in section 1(a)(1)-(3), above.

*Id.* at Sec. 2.(a).

Second, even if defendants' argument were a plausible reading of EO 13202's "to the extent permitted by law" language, the underlying grant-authorizing statutes simply do not support the prohibition on the use of PLAs that the EO 13202 has created. The Court has not surveyed the countless statutory provisions that authorize the distribution of federal funds, and neither have defendants. Defendants erroneously assert that the only statutes at issue here are those that authorized the funds for the Woodrow Wilson Bridge Project and Richmond's RTV Project. The issue before the Court is the President's authority to issue this EO 13202 § 3, not just the authority of DOT to implement EO 13202 with respect to these projects. If defendants are going to rely on the authority of the underlying funding statutes for this Executive Order, then defendants should have pointed to the language that supports EO 13202's blanket PLA prohibition in every statute that appropriates funds for entities conducting construction projects. Defendants have not, and the Court believes, can not, do that.

If the language of defendants' chosen examples is any indication of Congress' general practice, there is no statutory au-thority for § 3 to be found. Defendants argue that both the Woodrow Wilson Bridge Project and the RTV Village Project receive funding "under programs established pursuant to the Federal–Aid Highway Act, 23 U.S.C. § 101 et seq." Defs.' Surreply at 3.[11] The general references to "securing competition" and "conditions of project approval" cited by defendants as the foundation for § 3 simply can not be stretched so far as to support § 3's substantive conditions on the receipt of federal funding. Defendants cite a provision in the Federal–Aid Highway Act that allows the Secretary of Transportation to require "such plans and specifications and such methods of bidding as shall be effective in securing competition" as the basis for the authority of the President to prohibit the use of PLAs by funding recipients.[12] 23 U.S.C. § 122(a). That provision must be put in context; the statute states:

(a) In all cases where the construction is to be performed by the State transportation department or under its supervision, a request for submission of bids shall be made by advertisement unless some other method is approved by the Secretary. The Secretary shall require such plans and specifications and such methods of bidding as shall be effective in securing competition.

*Id.* Congress was clearly discussing the procedures for bid submission, and not the substantive requirements that a State may impose upon prospective bidders. The Act does discuss substantive requirements that

---

**11.** Curiously, defendants do not point to any language in the statute that actually appropriated the funds for the Woodrow Wilson Bridge Project. *See* Woodrow Wilson Bridge Authority Act, *as amended,* Pub.L. 105–78, 112 Stat. 159.

**12.** The Court notes that what the President has attempted to achieve here through an Executive Order is a regulation that the Sec- retary of Transportation could promulgate only through rule-making procedures required by the Administrative Procedures Act (APA). Because the statutory language does not provide the authority for the President's action, the Court need not address the questions raised by the President's attempted bypass of the APA's requirements.

bidders must fulfill; Congress explicitly *permitted* such requirements as long as they are lawful and bidders are given sufficient notice:

No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications.

23 U.S.C. § 112(b)(1). Had Congress intended to prohibit funding recipients from requiring the use of PLA's on each of these federally-funded projects, it certainly could have included language in each funding statute to that effect.

Defendants' second statutory authority argument is equally unpersuasive. Defendants rely on 31 U.S.C. § 6307(1), which authorizes the Director of the OMB to "issue supplementary interpretive guidelines to promote consistent and efficient use of procurement contracts, grant agreements, and cooperative agreements." This statute does delegate authority to OMB to adopt guidelines for the administration of grants; however, once again Congress was clearly referring to procedural rather than substantive requirements.

The purposes of the OMB statute are: 1) to "help eliminate unnecessary administrative requirements on recipients of Government awards by characterizing the relationship between executive agencies and contractors," 2) "prescribe criteria for executive agencies in selecting appropriate legal instruments," and 3) "promote increased discipline in selecting and using procurement contracts, grant agreements, and cooperative agreements, maximize competition in making procurement contracts, and encourage competition in making grants and cooperative agreements."

31 U.S.C. § 6301. The reference to increasing competition in using grants refers to competition among grant recipients, not among those with whom a grant recipient contracts. The competition that defendants argue is increased by EO 13202 is the competition among those contractors bidding on federally-funded projects, not competition among those asking for federal funds. Thus, 31 U.S.C. § 6307(1), can not provide the authority for a regulation aimed at creating substantive limitations on the requirements grant recipients can create for those with whom they contract.

In sum, neither the Constitution, the Procurement Act, the individual funding statutes, nor the OMB statute provide the necessary authority for § 3 of EO 13202. This Court has no choice but to invalidate § 3 of EO 13202 as an action beyond the scope of the President's authority.

## IV. NLRA Preemption

If any doubt remains as to whether the President had the constitutional or statutory authority to promulgate § 3 of EO 13202, the Court also holds that both § 1 and § 3 of EO 13202 are preempted by the NLRA. In the guise of preserving open competition and government neutrality, EO 13202 has altered the balance of power between labor unions and employers on federally-funded construction projects. Couched in the language of creating a free market in which unions and employers can negotiate PLAs without the mandate or support of the project owners, EO 13202 has actually interfered with existing market conditions. EO 13202 removes the ability of labor organizations, federal agencies, and recipients of federal funding to negotiate PLAs to be included in the bid specifications for construction projects. EO 13202 has thus altered market conditions by removing both a significant bargaining chip from the hands of

labor organizations, and an option from federally-funded construction projects that is available to private owner-developers. Even if the PLAs in question are not directly authorized by the NLRA because the funding recipients are public entities, the Supreme Court has indicated that such market interference by states would violate the *Machinists* doctrine of NLRA preemption. *See Building & Contr. Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (*Boston Harbor*). Indeed, the D.C. Circuit foreshadowed the present controversy in *Chamber of Commerce v. Reich*, a case holding that the NLRA preempts the President from interfering with the labor market through an Executive Order. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1337 (D.C.Cir. 1996). Because EO 13202 violates NLRA preemption doctrine, this Court grants plaintiffs' motion for summary judgment and enters a permanent injunction invalidating EO 13202.

### A. *Preemption and the NLRA*

■ Because the NLRA does not contain an express preemption provision, a court should not find a governmental regulation pre-empted "... unless it conflicts with federal law or would frustrate the federal scheme, or unless [the court] discern[s] from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States..." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747–748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *see also Boston Harbor*, 507 U.S. at 224, 113 S.Ct. 1190. Keeping this principle in mind, the Supreme Court has developed two specific preemption doctrines for the NLRA. *Met-*

*ropolitan Life*, 471 U.S. at 748, 105 S.Ct. 2380 ("The Court has articulated two distinct NLRA preemption principles."). The first, known as *Garmon* preemption prohibits regulation of activities that are "protected by § 7 of the [NLRA] or constitute an unfair labor practice under § 8." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *see also Wisconsin Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986); *Metropolitan Life*, 471 U.S. at 748–49, 105 S.Ct. 2380. The second, known as *Machinists* preemption prohibits regulation of areas that have been left by Congress "to be controlled by the free play of economic forces." *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *see also Boston Harbor*, 507 U.S. at 225, 113 S.Ct. 1190; *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 111, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (*Golden State II*); *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 614, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (*Golden State I*).

While most Supreme Court cases developing NLRA preemption doctrine have dealt with state regulation, it is clear that the same principles apply when the President attempts to regulate an area preempted by the NLRA through an Executive Order. *Reich*, 74 F.3d at 1334 ("The [NLRA preemption] principles developed, however, have been applied equally to federal governmental behavior that is thought similarly to encroach into the NLRA's regulatory territory.").[13]

### B. *Garmon Preemption*

■ EO 13202 does not violate the *Garmon* preemption rule with respect to

---

13. *Reich* also rejected the claim that a President's Executive Order was insulated from judicial review. 74 F.3d at 1326–32. Thus,

plaintiffs may bring a non-statutory cause of action for review of the legality of an Executive Order. *Id.*

federally-funded construction projects conducted by public entities. However, EO 13202 does violate *Garmon* preemption with respect to federally-funded projects conducted by private employers.

■ The Supreme Court in *Garmon* recognized that Congress' intent to exclusively occupy the field of labor policy would require judicial elucidation via inquiry into the scope of the NLRA: "Congress has formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of determination by fixed metes and bounds... This penumbral area can be rendered progressively clear only by the course of litigation." *Garmon*, 359 U.S. at 240, 79 S.Ct. 773 (*quoting Weber v. Anheuser–Busch Inc.*, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955)). The Court has further explained that *Garmon* preemption extends to activities that are either clearly or *"arguably"* protected or prohibited by the NLRA. *Boston Harbor*, 507 U.S. at 225, 113 S.Ct. 1190 (emphasis in original); *Wisconsin Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986) ("the *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act."). Plaintiffs

have raised a *Garmon* preemption claim, arguing that the President has regulated something that is "expressly protected" by § 8(e) of the NLRA. *See* Plaintiffs' Opening Brief at 43–44. Thus, this Court must determine whether the PLAs prohibited by EO 13202 are at least arguably authorized or prohibited by the NLRA.[14]

### 1. EO 13202

EO 13202 functions in two ways: it effectively prohibits federal agencies and recipients of federal funding from negotiating a project-wide PLA with labor unions, and it prohibits agencies or recipients from including any agreements voluntarily negotiated between labor unions and contractors directly in any bid specifications for the project. As discussed above, EO 13202 prohibits federal agencies and the recipients of federal funding from requiring or prohibiting PLAs in their construction contracts, bid specifications, or other controlling documents. EO 13202 § 1, 3 (a recipient shall not "require or prohibit bidders, offerors, contractors, or subcontractors to enter into or adhere to agreements with one or more labor organizations on the same or other related construction project(s).") This effectively prohibits recipients of federal funding from negotiating with labor unions and agreeing to a project-wide PLA that will be required of all contractors.

Generally, the method by which contractors are required to agree to a PLA is through the bid specification process a project owner will include the PLA in the

---

14. Much of defendants' discussion of this issue comes during its standing argument. *See* Defs.' Opp'n and Reply at 7—20 (arguing that because these PLAs are not protected by the NLRA, plaintiffs have no legally protected interest on which to base standing). As noted above, whether or not the NLRA regulates PLAs entered by public entities is relevant to the merits of the preemption claim, not to

standing and thus will be discussed here. Plaintiffs have not taken an entirely clear position on this issue, as their brief at times claims the PLAs negotiated by public entities are protected by the NLRA and at times admits that they are not. *Compare* Pls.' Opening Br. at 19, 43–44 (NLRA applies) *with* Pls.' Opening Br. at 38 n. 34 (NLRA does not apply to public projects).

bid specifications as a material requirement. If a project owner can not include a PLA in the bid specifications or other documents, as is prohibited by EO 13202, it can not enforce the PLA. Because it can not enforce the PLA, negotiating one would be pointless.

In addition, while EO 13202 prohibits agencies and funding recipients from requiring PLAs, it also states that "nothing in this section shall prohibit contractors or subcontractors from voluntarily entering into agreements described in subsection [a]." EO 13202 at § 1(c). Thus, under EO 13202 labor unions and contractors are free to negotiate individual labor agreements. Plaintiffs argue that such individual agreements differ from a PLA in that they are unlikely to cover an entire project. Further, EO 13202 prohibits any such individual agreements from being included in the bid specifications for the project if the project is to receive federal funding. As discussed above, the mechanism by which PLAs are negotiated for public construction projects relies for the enforcement of the agreement on the inclusion of that agreement in the bid specifications. Indeed, many states statutorily require that any PLAs be included in those bid specifications. *See* Mem. of Law of Amicus Curiae New York State Thruway Authority at 5–6; Mem. of Law of Amicus Curiae State of Maryland at 9. Thus, the "voluntary" negotiation provision of EO 13202 is a poor substitute for the ability of recipients and labor organizations to negotiate and require PLAs.

Defendants have argued that EO 13202 requires only that a recipient not use a PLA for the portion of the project using federal funds subject to 13202. *See* Defs.' Opp'n and Reply at 21—27 (arguing that the City of Richmond can segregate funds and use a PLA on the 97 percent of the project not subject to the EO). As dis-

cussed above with respect to Richmond's RTV project, such segregation is contrary to the plain language of EO 13202. EO 13202 clearly prohibits the requirement of a PLA in any bid specifications or contracts for a federally-funded project.

2. *The Scope of NLRA § 8(e) and (f)*

The NLRA defines and proscribes unfair labor practices and creates a uniform system of labor law for the country. 29 U.S.C. § 158 (2000); *Reich,* 74 F.3d at 1338. The provisions of the NLRA at issue here, § 8(e) and (f), were added to the NLRA by Congress in 1959. Section 8(e) prohibits the use of pre-hire agreements such as PLAs, but also includes an exception for the construction industry:

> nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.

29 U.S.C. § 158(e). Section 8(f) further provides,

> [i]t shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members,

and then goes on to describe several types of generally prohibited agreements to which the exception is created. 29 U.S.C. § 158(f). Congress' intent in creating these exceptions for the construction industry was explained by the Supreme Court in *Boston Harbor:*

It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry. See S.Rep. No. 187, 86th Cong., 1st Sess., 28, 55–56 (1959); H.R.Rep. No. 741, 86th Cong., 1st Sess., 19–20 (1959) U.S.Code Cong. & Admin. News p. 2318.

507 U.S. at 231, 113 S.Ct. 1190.

Sections 8(e) and (f) of the NLRA do not apply to PLAs negotiated and required by public recipients of federal funding, like the State of Maryland or Richmond in this case, or by federal agencies themselves, for two reasons that were articulated by the Supreme Court in *Boston Harbor*. 507 U.S. at 230–31, 113 S.Ct. 1190.[15]. First, the exceptions in §§ 8(e) and (f) specifically apply to "employers," and public entities are expressly excluded from the definition of employer in the NLRA. 29 U.S.C. § 152(2) ("employer" does not include, "United States or any wholly owned Government corporation ... or any State or political subdivision thereof"); *Boston Harbor*, 507 U.S. at 230–31, 113 S.Ct. 1190. Second, when a public entity, like a federal agency, the State of Maryland in the present case, or the State of Massachusetts in *Boston Harbor*, advertises for bids by general contractors who then hire subcontractors on a construction project, according to the Supreme Court the State is acting not as an employer, but as a "purchaser" of contracting services. *Id*. As such a purchaser rather than an employer, §§ 8(e) and (f) do not apply. *Id*.

Plaintiffs argue that PLAs required by public recipients of federal funding are authorized by the NLRA, and rely on language from *Boston Harbor*. *See* Pls.' Opening Br. at 19, 33–34, 43–44. However, the passages from *Boston Harbor* cited by plaintiffs do not bear the weight plaintiffs would have them support. The Supreme Court did recognize in *Boston Harbor* that public owners should be able to require PLAs because Congress intended for that decision be left to the free play of economic forces, and therefore recognized the applicability of *Machinists* preemption doctrine. However, contrary to plaintiffs' argument, the Court did not conclude that a public owners' PLA was authorized or protected by the NLRA. Rather, for the two reasons described above, the Court concluded that these PLAs were beyond the reach of express NLRA regulation. In a footnote, plaintiffs seem to concede that PLAs "negotiated directly between a public entity and a union" would not be covered by §§ 8(e) and (f). *See* Pls.' Opening Br. at 38 n .34. In distinguishing "directly" negotiated PLAs, which would not be covered, from the PLA at issue on the Woodrow Wilson Bridge Project, which they claim is covered, plaintiffs must be relying on the fact that the State of Maryland hired a project manager, Kaiser, to negotiate the PLA. However, because Kaiser was clearly acting as an agent of the state, that distinction makes no difference here. The PLA negotiated between BCTD, Kaiser and the State of Maryland for the Woodrow Wilson Bridge Project,

---

**15.** While the Court in *Boston Harbor* did recognize that public entities' PLAs were outside the scope of the NLRA's express regulations, importantly, the Court recognized that these PLAs were within "Congress' intended free play of economic forces" for purposes of *Machinists* preemption, discussed below. 507 U.S. at 232, 113 S.Ct. 1190.

does not fall within the express provisions of §§ 8(e) and (f).

However, §§ 8(e) and (f) clearly apply to PLAs required by private employers. *See, e.g., Woelke & Romero Framing, Inc. v. N.L.R.B.,* 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982).

### 3. *Garmon Applied to EO 13202.*

Because the NLRA does not specifically prohibit or authorize the use of PLAs by construction projects owned by public entities, there is no conflict between EO 13202 §§ 1 and 3 with Congress' "integrated scheme of regulation" specified in NLRA §§ 7 and 8. *Garmon,* 359 U.S. at 247, 79 S.Ct. 773. Although *Garmon* preemption also applies to activities *arguably* prohibited or authorized by EO 13202, the NLRA is clear that public entities are not employers for purposes of §§ 8(e) and (f). EO 13202 therefore does not violate the principles of *Garmon* preemption with respect to its prohibition of PLAs required by federal agencies or public recipients of federal funding. EO 13202 §§ 1 and 3.

However, because the NLRA does specifically authorize the use of PLAs by private employers in § 8, EO 13202's prohibition of required PLAs does violate *Garmon* preemption doctrine with respect to any private recipients of federal funding who act as employers in construction projects. Private entities are being prohibited by EO 13202 from requiring PLAs that are expressly allowed by the NLRA. *Garmon* preemption will not allow this direct conflict. EO 13202 is preempted with respect to private recipients of federal funding.

### C. *Machinists Preemption*

1. *EO 13202 §§ 1 and 3 Violate Machinists Preemption.*

As the Supreme Court explained in *Boston Harbor,* "*Machinists* preemption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." 507 U.S. at 226, 113 S.Ct. 1190 (internal quotations omitted); *see also Golden State I,* 475 U.S. at 614, 106 S.Ct. 1395. The Supreme Court has consistently held that a state, local (or federal) government "lacks the authority to introduce some standard of properly balanced bargaining power . . . or to define why economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining." *Boston Harbor,* 507 U.S. at 226, 113 S.Ct. 1190 (internal quotations omitted); *see also Golden State I,* 475 U.S. at 614, 106 S.Ct. 1395; *Machinists,* 427 U.S. at 149–50, 96 S.Ct. 2548. This is precisely what the President has attempted to do with EO 13202. EO 13202 impermissibly attempts to create an ideally balanced state of bargaining according to the President's conception of open competition among labor and management.

As the D.C. Circuit explained in *Reich,* the principle underlying *Machinists* preemption is that "union and management proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest . . . The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the [NLRA] recognized.'" 74 F.3d at 1334 (*quoting NLRB v. Insur. Agents' Int'l Union,* 361 U.S. 477, 488–89, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)). Here, the Executive Order removes an economic weapon from the arsenals of two different groups: federal agencies and the recipients of federal funding lose the ability to require PLAs in their bid specifications and labor organizations lose the ability to negotiate PLAs directly with the recipient owner-developers.

Indeed, the D.C. Circuit in *Reich* foreshadowed this case: "we very much doubt the legality of President Bush's Executive Order 12,818–since revoked, but upon which the government relies–that banned government contractors from entering into pre-hire agreements under § 8(f)." 74 F.3d at 1337. EO 13202 is substantively the same as the former President Bush's Executive Order 12818. The reason the D.C. Circuit expressed doubt about the legality of such an Executive Order was because the Supreme Court's analysis in *Boston Harbor* made it clear that a regulation mandating or prohibiting pre-hire agreements would violate the *Machinists* preemption rule.

In *Boston Harbor*, the Supreme Court addressed the argument that a decision by the State of Massachusetts and its project manager for the Boston Harbor clean-up to include a PLA in its bid specifications was government regulation that violated NLRA preemption principles. The Court rejected that argument, holding that the decision by the State with respect to this one project did not constitute regulation, but rather was the action of a market participant, and as such could not run afoul of either *Garmon* or *Machinists* preemption. 507 U.S. at 232, 113 S.Ct. 1190. In so deciding, the Court discussed the goals of NLRA §§ 8(e) and (f), and the implications of a decision by the Court prohibiting a state from requiring a PLA. 507 U.S. at 231–32, 113 S.Ct. 1190. The Court recognized that "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same." *Id.* Without an indication from Congress that "a State may not manage its own property when it pursues its purely property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted," the

Court concluded that it would not "infer such a restriction." *Id.* The Court explicitly stated that such an inference by the Court, as a form of governmental regulation of the labor market, could run afoul of *Machinists* preemption principles: "Indeed, there is some force to petitioners' argument ... that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*." *Id.* at 232, 113 S.Ct. 1190.

While the Court in *Boston Harbor* was discussing the impact of its own decision on actors in the labor market, there is no material difference between a judicial action and the Executive Order as forms of government regulation. Both would impermissibly "deny[ ] an option to public owner-developers that is available to private owner-developers." *Id.* at 232, 113 S.Ct. 1190. By prohibiting the recipients of federal funding the option of requiring a PLA in their bid specifications, EO 13202 impermissibly interferes with the free play of economic forces that only Congress can regulate. *See also Reich*, 74 F.3d at 1337 ("Surely, the result [of the Boston Harbor case] would have been entirely different, given the Court's reasoning, if Massachusetts had passed a general law or the Governor had issued an Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements ... containing § 8(e) prehire agreements.").

Furthermore, while the *Boston Harbor* Court focused on the disparity between public and private developers, EO 13202 also removes an economic weapon from the arsenal of labor organizations. *Machinists* preemption is concerned with the areas left to the free play of economic forces between both employers and employees. *Reich*, 74 F.3d at 1337 (holding that an

Executive Order disqualifying employers who hire permanent replacement workers during strikes from government contracts violates *Machinists* preemption). Any attempt to regulate either of these groups is problematic. As the D.C. Circuit explained in *Reich*, "No state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes, whatever his or her purpose may be." 74 F.3d at 1337.

### 2. *Defendants' Arguments to the Contrary are Not Persuasive.*

Defendants have raised several arguments during the course of this litigation against the applicability of *Machinists* preemption. First, EO 13202 is not preempted by the NLRA because it imposes no sanctions on funding recipients. Second, EO 13202 was the act of the federal government as a market purchaser, and under *Boston Harbor* is therefore not subject to NLRA preemption. Third, *Machinists* preemption does not apply here because the government has only attempted to establish neutrality, rather than skewing the labor market. Fourth, *Machinists* preemption does not apply here because while NLRA preemption precludes government interference with rights protected by the NLRA, it does not require the government to subsidize those rights. Fifth, because EO 13202 allows "voluntary" PLAs among contractors and labor unions, it represents a minimal intrusion into the collective bargaining process.

### a. *Defendants' Sanction Argument.*

Defendants argue that EO 13202 does not conflict with the NLRA because it imposes no sanctions on entities regulated or protected by the NLRA. *See* Defs.' Opp'n and Reply at 39—46. Thus, defendants attempt to distinguish the *Reich* case by demonstrating that the Executive Order in *Reich* directly sanctioned employers who were subject to express NLRA provisions. While it is unclear from defendants' brief, this argument can best be understood as a variation on the *Garmon* theme: that here there is no direct conflict between EO 13202 and an area expressly protected or prohibited by the NLRA, and therefore EO 13202 is not pre-empted under *Garmon* principles. While defendants' focus on sanctions is misplaced,[16] the basic thrust of the argument has merit. *See* Defs' Opp'n and Reply at 45 and 56. As discussed above, with respect to public recipients of federal funding, *Garmon* preemption does not apply.

### b. *Defendants' Market Participant Argument.*

Defendants also argue that EO 13202 is a reflection of the federal government's proprietary interest and not an attempt to regulate the labor market. Relying on the Supreme Court's holding in *Boston Harbor* that Massachusetts was not subject to NLRA preemption when acting as a market participant rather than as a regulator, defendants argue that EO 13202 is a reflection of the government's proprietary interest in determining how its money is spent. *See* Defs.' Opp'n and Reply at 58.

In support of this argument, defendants claim that in order for government action to be considered regulatory for NLRA

---

**16.** *Garmon* preemption is clearly not limited to those government actions that impose sanctions or deny government benefits to entities covered by the NLRA. Rather, interference of any form, with the activities that constitute "Congress' integrated scheme of regulation," meaning "activities that are protected by § 7 of the NLRA, or constitute an unfair labor practice under § 8" is prohibited under *Garmon*. *Boston Harbor*, 507 U.S. at 224, 113 S.Ct. 1190 (*citing Garmon*, 359 U.S. at 244, 79 S.Ct. 773).

preemption purposes it not only must be of general application, but also reflect an intent to regulate labor policy. *See* Defs.' Opp'n and Reply at 59—60. This is not correct. Both *Boston Harbor* and *Reich* made clear that the nature of a regulatory versus proprietary action is a separate question from the question of whether that action interferes with something either regulated by the NLRA or left for the free play of economic forces. *Reich,* 74 F.3d at 1335-36 ("[w]e are ... quite reluctant to consider the President's motivation in issuing the Executive Order... It is not necessary for us to question the President's motivation in order to determine whether the Order is a regulation..."). The government's argument conflates these two separate inquiries by hinging the regulatory nature of an action on an intent to regulate labor.

EO 13202 is clearly a regulatory act rather than the government "act[ing] just like a private contractor would act." *Reich,* 74 F.3d at 1336 (*quoting Boston Harbor,* 935 F.2d 345, 366 (Breyer, C.J. dissenting)). EO 13202 sets a blanket rule and does not require government agencies to act on a project-by-project basis, as was the case in *Boston Harbor.* Section 3 of EO 13202 attempts to regulate the behavior of entities other than the federal government, an action that is uniquely governmental. With respect to § 1 of EO 13202, the rule for federal agencies, the D.C. Circuit held that the similar directive to federal agencies at issue in *Reich* was a regulatory rather than proprietary act. 74 F.3d at 1337. Indeed, the D.C. Circuit contrasted what the Supreme Court held to be the proprietary action of Massachusetts in *Boston Harbor* with a hypothetical action by Massachusetts very similar to EO 13202. *Id.* at 1336. "Surely," emphasized the D.C. Circuit, "the result would have been entirely different, given the Court's reasoning [in Boston Harbor], if Massachusetts has passed a general law or

the Governor had issued an Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements." *Id.* at 1337.

Finally, defendants argue that EO 13202 must be a proprietary action because it imposes no sanctions or restrictions on anyone other than federal agencies and recipients of federal funds. However, by imposing a general condition for all federal agencies and all recipients of federal funding under all funding statutes, the government has acted in a regulatory capacity. The fact that no one other than the agencies or the funding recipients may be sanctioned does not alter the broad policy implications of EO 13202. The government is using the power of its purse to control and regulate the behavior of other market participants. *Boston Harbor,* 507 U.S. at 233, 113 S.Ct. 1190.

### c. *Defendants' Neutrality Argument.*

In attempting to counter plaintiffs' *Machinists* argument, defendants argue that EO 13202 was intended to "take governmental entities out of the decision-making process" and "to allow the question of whether or not to use a PLA to be settled through bargaining between construction contractors and labor organizations." Defs.' Opp'n and Reply at 67. Defendants actually concede that "[t]o be sure, EO 13202 affects market conditions by precluding federal agencies and federal grantees from mandating the use of PLAs on federal or federally financed construction projects." *Id.*

*Machinists* preemption applies to governmental attempts to establish "neutrality" in the labor market as much as it does to attempts to skew the balance of power in favor of employers or employees. Government "lacks the authority to introduce some standard of properly balanced bar-

gaining power... or to define why economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining." *Boston Harbor,* 507 U.S. at 226, 113 S.Ct. 1190 (internal quotations omitted). Even if EO 13202 was aimed at creating a free market in which labor and employers could interact, and not intended to remove economic weapons from labor organizations, the President does not have the authority to establish his vision of a neutral labor market. *Reich,* 83 F.3d 439, 440 (denying petition for rehearing) ("[*Machinists* ] does prevent any government action ... that is predicated upon (implicitly or explicitly) a substantive policy view as to the appropriate balance of bargaining power between organized labor and management and that attempts to promote a governmental objective by a generic shift in that balance."). Thus, because EO 13202 reflects the President's attempt to establish a "neutral" labor market, and in doing so actually removes economic options from both labor and management, EO 13202 is preempted under *Machinists* doctrine.

d. *Defendants' Rights Subsidization Argument.*

Defendants also attempt to avoid *Machinists* preemption with the argument that government refusals to subsidize rights do not infringe upon rights. Citing *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), they argue that since a governmental refusal to subsidize something protected by the NLRA, can not be an infringement of rights under the NLRA, EO 13202 can not be said to conflict with the NLRA. This argument misses the point of *Machinists* preemption. Once again, *Machinists* preemption is not concerned with rights created under the NLRA, but focuses on an area Congress intentionally left unregulated. *Machinists,* 427 U.S. at 144, 96 S.Ct. 2548. The Court's inquiry must focus not on whether the government's conditional refusal to subsidize an activity has infringed upon a particular right, but whether it constitutes a regulatory interference with the free play of economic forces. Plaintiffs may not have a right under the NLRA to negotiate PLAs with public recipients of federal funding, but neither does the Executive branch have the right to prevent such negotiations. That regulation is for Congress, and Congress alone.

e. *Defendant's Voluntary PLA Argument.*

Defendants also argue that because EO 13202 allows for voluntary PLAs, the intrusion on the collective bargaining process is minimal and therefore can not violate *Machinists* preemption. Even if voluntary PLAs were an adequate substitute for mandatory PLAS, as the D.C. Circuit stated in *Reich,* "[w]e do not think the scope of the President's intervention into and adjustment of labor relations is determinative." 74 F.3d at 1338. However, as explained above, the voluntary labor agreements allowed under EO 13202 are poor substitutes for the prohibited PLAs for two reasons: first, the voluntary PLAs are not permitted to be included in the bid specifications and are therefore difficult to enforce; and second, the likelihood of all parties on a project independently agreeing to the same terms after contracts have been awarded is slim.

Defendants arguments have not persuaded the Court that both § 1 and § 3 of EO 13202 can avoid *Machinists* preemption. The President has intruded upon a sphere that only Congress can regulate and therefore this Court must permanently enjoin EO 13202.

### CONCLUSION

For the foregoing reasons, the Court is persuaded that all plaintiffs in this case

have standing to challenge EO 13202. The Court is also persuaded by precedent of long-standing that by issuing EO 13202, the President exceeded his constitutional and statutory authority, at least with respect to § 3. In addition, because the President has attempted through EO 13202 to establish his vision of a neutral labor market, and in doing so removed an economic weapon from labor organizations, federal agencies, and the recipients of federal funding, the Court is persuaded that EO 13202 § 1 and § 3 violate the *Machinists* principle and are preempted by the NLRA. Finally, with respect to private recipients of federal funding, EO 13202 § 3 is in direct conflict with § 8(e) of the NLRA and is preempted under the *Garmon* principle.

Accordingly, the plaintiffs' motion for summary judgment is **GRANTED** and the defendants' motion for summary judgment is **DENIED**. Constitutional and statutory precedent of long-standing persuades the Court that the President lacked the requisite authority for Executive Order 13202 § 3 and that Executive Order 13202 in its entirety is preempted by the NLRA. Accordingly, enforcement of Executive Order 13202 is permanently enjoined by the Court.

An appropriate Order accompanies this Memorandum Opinion.

### *ORDER*

For the reasons stated in the Memorandum Opinion filed today, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment is **GRANTED**; it is

**FURTHER ORDERED** that defendants' motion for summary judgment is **DENIED**; it is

**FURTHER ORDERED** that the President lacked the requisite authority for Executive Order 13202 § 3 and that Executive Order 13202 in its entirety is preempted by the NLRA; it is

**FURTHER ORDERED** that enforcement of Executive Order 13,202 is permanently enjoined; it is

**FURTHER ORDERED** that the Clerk of the Court enter final **JUDGMENT** in favor of plaintiffs and against defendants.

**IT IS SO ORDERED.**